UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,      **REPORT AND**
  - v -             <u>**RECOMMENDATION**</u>

PHILLIP J. MILLIGAN, et al.,      CV-99-7357 (NG)(VVP)

        Defendants.
----------------------------------------------------------x

POHORELSKY, Magistrate Judge:

  After adopting my report and recommendation concerning the plaintiff's motion for summary judgment in this matter, Judge Gershon referred this matter back to me for a hearing and recommendation concerning the amount of disgorgement that the defendant Phillip J. Milligan should be ordered to pay, and for the preparation of a proposed form of judgment. Having held a hearing and upon consideration of the testimony and the submissions on the motion for summary judgment, I make the findings and recommendations below.

### I. DISGORGEMENT

  The following principles guide the decision on this matter. The purpose of disgorgement is to deprive wrongdoers of the gains resulting from their illicit conduct and to deter others from engaging in similar unlawful actions. *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996) (citing *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (per curiam)). That amount, as courts have consistently held, "need be only 'a reasonable approximation of profits causally connected to the violation' and any risk of uncertainty in calculating the amount 'should fall on the wrongdoer whose illegal conduct created that

uncertainty.' " *SEC v. Svoboda*, 409 F. Supp. 2d 331, 344 (S.D.N.Y. 2006) (quoting *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995)). In arriving at a proper disgorgement figure, courts employ a burden-shifting approach. *See id*. To that end, the SEC bears the initial burden of "demonstrat[ing] that the disgorgement amount is a reasonable approximation," after which the burden shifts to the defendant " 'to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged.' " *Id.* (quoting *SEC v. Save the World Air, Inc.*, No. 01 Civ 11586, 2005 WL 3077514, at *17 (S.D.N.Y. Nov. 15, 2005)) (additional citation omitted).

At the evidentiary hearing concerning disgorgement, the plaintiff offered testimony by Raimond Irni, a participant in the fraudulent scheme that involved the defendant Milligan. Irni testified about his involvement with Timothy Masley and others who promoted the sales of stock by paying kickbacks to brokers. Tr. 9-12.[1] Irni further testified that in working with Masley he came into contact with Milligan, Tr. 12-14, and that at Masley's direction he forwarded funds from his own account to an account held by Milligan, Tr. 15-18. The plaintiff also offered banking records, which Irni identified, that reflected transfers totaling $93,600 from Irni's account, held in the name of Habib Capital, to an account held in the name of Stone International Trading Co. Exs. 10, 11. Irni lacked any specific recollection of the purpose of either of the transfers. Tr. 39-40.

The plaintiff also called Milligan as an adverse witness, and Milligan further testified on his own behalf in narrative form as well. In his testimony, Milligan acknowledged that he

---

[1]"Tr." refers to the transcript of the disgorgement hearing held on January 24, 2008; "Ex." refers to exhibits introduced or identified at the hearing.

received the $93,600 from Irni, Tr. 47, but provided an innocent explanation of the reasons for the transfers. He explained that one of the transfers, in the amount of $60,000, was repayment of a debt of $30,000 plus interest of $30,000 incurred by Irni. Tr. 57-58, 61-62. He said that the remaining transfer in the amount of $33,600 was partial repayment of funds he had earlier paid to "the Curtis Group" for the purchase of stock that he never received.[2] Tr. 58-59. He denied that any of the money he received through those transfers constituted monetary gain he obtained from the fraudulent scheme. Tr. 43-44. He contended instead that the money or financial gain that he received for his participation in the scheme was limited to a fishing trip in Venezuela, the value of which he was unable to estimate. Tr. 44, 65, 69.

In discussing the $30,000 debt purportedly incurred by Irni, Milligan referred to a promissory note apparently signed by Irni which was marked for identification but not offered by either the plaintiff or the defendant.[3] Tr. 59-62. The note was dated May 16, 1995. Milligan also referred to two bank records which were also not offered in evidence, a bank statement reflecting a debit to an account in the name of Stone International Trading Corporation in the amount of $30,000 on May 16, 1995 and an application for the transfer of those funds apparently

---

[2]Although not fully explained in the testimony at the hearing, the Curtis Group is described in the indictment of the defendant. *See* Ex. 6. The Curtis Group consisted of various individuals, including Irni, who were involved in promoting stock in various companies as part of their scheme to defraud investors. One of the companies was Pilot Transport Inc., whose shares Milligan agreed to promote as part of the scheme.

The indictment which contains the offense to which Milligan pleaded guilty, was received in evidence without objection as Exhibit 6, but subject to the submission of a page that was missing in the copy that was marked in evidence. The SEC has since informed the court that it has been unable to obtain the missing page either from the court's file or from the United States Attorney's Office. As the missing page (page 14) concerned a charge to which Milligan did not plead guilty, and as there was no suggestion by either party that any information on the page was relevant to any matter before the court, neither party is prejudiced by receipt of the exhibit notwithstanding the missing page.

[3]The note was marked by the plaintiff as Exhibit 12 for identification.

signed by Milligan.[4]  Tr. 56-57.  Milligan testified that the documents evidenced his loan of

$30,000 to Irni.  He provided no details about how the loan came to be made, or the reasons for

it.  He did not ask Irni about the documents, and Irni did not acknowledge ever receiving any

kind of loan from Milligan.

In evaluating the testimony at the hearing provided both by Irni and Milligan, the court

has little confidence in the truthfulness of either witness.  The court's evaluation of Irni's

credibility is based both on his testimony at the hearing and on his testimony in a trial before the

court involving other defendants in this action.  On both occasions, the manner in which he

testified convinced the court that he had little regard for the accuracy of his statements under

oath, and was more interested in saying whatever he needed to say to complete his testimony

rather than being careful to insure that his testimony was truthful.  Similarly, the court has had

the opportunity to evaluate Milligan's testimony both at the hearing and in a prior proceeding in

this case.  The court found his testimony at the prior proceeding to be untruthful on critical

points, and rejected it in reaching the factual determinations that were made.  See Transcript of

Oral Report and Recommendation, Feb. 8, 2005, at Dkt. Entry 156.  At the disgorgement

hearing, the court similarly found aspects of his testimony equally incredible.  For instance, his

testimony that the only benefit he received for participation in the fraudulent scheme was a

fishing trip is at odds with the statement he made under oath when pleading guilty to securities

---

[4]The documents were among the handful of documents produced by Milligan in discovery which were collectively marked for identification as Exhibit 5 by the plaintiff; they were also attached as exhibits in Milligan's submissions in opposition to the summary judgment motion.  The transfer application authorizes a transfer of funds to the First Union Bank of Jacksonville for the benefit of Global Talent Guild, Inc.  No testimony by Milligan or Irni authenticated the transfer application (or any of the other documents) or established any connection between Global Talent Guild, on the one hand, and Irni or anyone else in the Curtis Group, on the other.

fraud, where he admitted that he received money or property for his participation in the scheme. More significantly, at the disgorgement hearing he testified that he lied under oath during his plea allocution, Tr. 77, reinforcing the court's view that he does not take the oath, or the need to testify truthfully, with any seriousness. It is also significant in evaluating his credibility that Milligan has been convicted of securities fraud, a felony involving dishonesty. *See* Fed. R. Evid. 609. The court thus concludes that Milligan has no difficulty testifying in a manner consistent with his own self-interest, as he perceives it, regardless of what the truth might be, and that his testimony therefore cannot be believed absent substantial corroboration.

Given the lack of confidence in the testimony of either witness, the court relies primarily on the bank records and the uncontested facts for the conclusion that Milligan received at least $93,600 for his participation in the fraudulent scheme. There is no dispute that Milligan received a total of $93,600 through wire transfers from Irni's account. Those funds are reflected in Exhibits 10 and 11. There is no dispute that Milligan and Irni participated together in a fraudulent scheme concerning Pilot stock. Milligan pleaded guilty to a criminal charge relating to the scheme. As Irni testified, Irni and Milligan barely knew one another; Irni said he saw Milligan on perhaps one occasion. Tr. 12-14. Milligan did not contend otherwise. Thus Milligan's explanation that $60,000 of the $93,600 that he received from Irni was for the repayment of an unsecured $30,000 loan that he made to Irni, plus $30,000 in interest, is simply incredible. Who would loan money in that amount to someone like Irni, a fellow con artist whom Milligan barely knew. And why would Irni agree to pay 200% interest for such a loan.[5]

---

[5] The loan was supposedly made in May 1995 and repaid in November 1995. A more plausible explanation for the documents reflecting the supposed "loan" is that they were generated to provide a cover story for the expected kickbacks. Since Milligan produced in discovery no other contemporaneous bank records for the various accounts he controlled at that time, there is no way of knowing whether the

The explanation that the remaining $33,600 was partial repayment of $75,000 that Milligan paid for stock he never received is similarly not credible. The $75,000 was supposedly transmitted by Milligan in May 1994, but Milligan offered no evidence other than his own testimony to prove such a transfer was made to Irni or the Curtis Group for any such purpose.[6] Moreover, the wire transfer of $33,600 from Irni to Milligan was not made until February 1996, some 21 months later, and there is no documentary evidence to suggest that the transfer was related in any way to the $75,000 payment Milligan supposedly made for stock in May 1994.

Given the absence of any credible evidence that Milligan and Irni had any business relationship with one another other than their mutual involvement in the fraudulent scheme to which Milligan pleaded guilty, and the absence of any credible explanation for the transfers totaling $93,600 made by Irni to Milligan other than that they constituted compensation for Milligan's participation in the scheme, the court concludes that the plaintiff has met its burden of providing evidence to demonstrate that the disgorgement amount of $93,600 that the plaintiff seeks is a "reasonable approximation of profits causally connected to the violation." *See Patel*, 61 F.3d at 139. Since "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty," *Patel*, 61 F.3d at 140 (*quoting SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir.1989)), the court further concludes that the

---

transfer reflected in the bank record was repaid to him through a parallel wire transfer to the same, or some other account.

[6]Among the few documents that Milligan produced in discovery, which were collectively marked by the plaintiff as Exhibit 5 but which were not introduced in evidence, is a customer advice reflecting that a debit from an account in the name of J.P. Milligan Inc. was made on May 12, 1994. The advice does not name the recipient or state the purpose of that transfer of funds.

defendant has not provided evidence sufficient to satisfy the court that he received less than that amount as compensation for his involvement in the fraudulent scheme.

## II. FORM OF JUDGMENT

Annexed to this Report and Recommendation is a proposed Final Judgment and Injunction which sets forth the various items of relief the court has ordered in granting summary judgment, including the amount of disgorgement. The proposed Final Judgment does not include the amount of prejudgment interest to be awarded as the amount proposed in the plaintiff's moving papers has become outdated during the pendency of the motion. Accordingly, the plaintiff is directed to submit to the court new calculations of the amount of prejudgment interest, set forth in substantially the same form as those calculations were presented in the plaintiff's moving papers. See Declaration of Bohdan S. Ozaruk, Ex. 9. The Commission's submission should be made within ten days and should include calculations through October 31, 2008.

## III. CONCLUSION

For the foregoing reasons, I recommend that the defendant be required to pay disgorgement in the amount of $93,600, and that the annexed Final Judgment and Injunction as to Phillip J. Milligan be entered after insertion of the specific amount of prejudgment interest as provided in the calculations to be submitted by the plaintiff.

\*         \*         \*         \*         \*         \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified

time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:  Brooklyn, New York
         October 9, 2008